# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROBERT BUCK,

       *Plaintiff*,

  v.

WASHINGTON METROPOLITAN AREA
TRANSIT AUTHORITY,

       *Defendant.*

Civil Action No. 17-632 (RDM)

## <u>MEMORANDUM OPINION</u>

This case presents the following question of first impression: Does the Civil Rights
Remedies Equalization Act ("CRREA"), 42 U.S.C. § 2000d-7, waive the sovereign immunity of
state transportation agencies for purposes of civil actions brought by private parties under the
National Transit Systems Security Act ("NTSSA"), 6 U.S.C. § 1142?

Plaintiff Robert Buck, a former employee of Defendant Washington Metropolitan Area
Transit Authority ("WMATA"), brought this suit against WMATA, alleging that it violated the
whistleblower protection provisions of the NTSSA by firing him because he provided
information to his supervisors about public safety violations at WMATA. Dkt. 1. The NTSSA,
among other things, prohibits public transportation agencies from "discharg[ing]" or otherwise
"discriminat[ing] against an employee" based "in whole or in part" on the employee's "lawful,
good faith" provision of information relating to conduct that "the employee reasonably believes
constitutes a violation of any Federal law, rule, or regulation relating to public safety or security"
to "a person with supervisory authority over the employee." 6 U.S.C. § 1142(a). To enforce
this right, the NTSSA permits an aggrieved party to file an administrative complaint with the

Secretary of Labor and, if the Secretary does not issue a final decision within 210 days, to bring a "de novo" action against his employer in federal district court. *Id.* at § 1142(c)(1), (c)(7).

The wrinkle presented here is that WMATA is an agency of the States of Maryland and Virginia (as well as of the District of Columbia) and is, therefore, entitled to immunity from private suit under the Eleventh Amendment. *See Barbour v. Wash. Metro. Area Transit Auth.*, 374 F.3d 1161, 1163 (D.C. Cir. 2004). Nothing contained in the NTSSA puts the States on clear notice that, by accepting federal transportation funds, they implicitly waive their immunity from suit under the NTSSA. The one statute that even arguably provides such notice is the CRREA, which abrogates the Eleventh Amendment immunity of the States for purposes of private suits brought in federal court for violations "of section 504 of the Rehabilitation Act of 1973, title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, title VI of the Civil Rights Act of 1964, or the provisions of *any other Federal statute prohibiting discrimination by recipients of Federal financial assistance*." 42 U.S.C. § 2000d-7(a)(1) (emphasis added). The dispositive question, accordingly, is whether the NTSSA is—like the Rehabilitation Act, Title IX, the Age Discrimination Act, and Title VI—a "statute prohibiting discrimination by recipients of Federal financial assistance."

Because the Court concludes that it is not, and because Plaintiff fails to identify any other applicable waiver or abrogation of WMATA's sovereign immunity, the Court lacks jurisdiction and must, accordingly, grant WMATA's motion for summary judgment and dismiss the case.

## I. BACKGROUND

### A.  Factual Background

For purposes of WMATA's motion for summary judgment, the Court "must view the evidence 'in the light most favorable to'" Plaintiff, as the nonmoving party. *Tolan v. Cotton*, 572

U.S. 650, 657 (2014) (per curiam) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

Plaintiff worked as an at-will supervisor at the Landover Division, and later the Four Mile Division, of WMATA. Dkt. 19-7 at 5, 7 (Buck Dep. 15:16–20, 25:14–20). His work involved "direct[ing] all [b]us [t]ransportation related work and activities for his . . . assigned sector," including "correct[ing] safety . . . issues." Dkt. 19-3 at 1–2 (Def. Ex. 2). Plaintiff was required to inform his supervisors when a bus "operator did anything" constituting "a violation of WMATA safety rules." Dkt 19-7 at 7 (Buck Dep. 24:11–25:4). He was responsible for discipling the operator, documenting the violation, and "forward[ing]" the relevant document to the appropriate parties. *Id.* (Buck Dep. 25:4); Dkt. 21-1 at 31 (Pl. Ex. 3). One of Plaintiff's safety-related job duties included "[o]versee[ing] [the] DriveCam program and" providing "feedback" to ensure that drivers received effective "coaching," discipline, and "training." Dkt. 21-1 at 31 (Pl. Ex. 3). The DriveCam program maintains video recording devices in WMATA buses that allow WMATA to monitor operators' performances and other information. *See* Dkt 19-7 at 10 (Buck Dep. 34:4–35:16). Although Plaintiff was not a union member, many of the employees that he worked with and supervised at WMATA were. *See id.* at 5–6 (Buck Dep. 15:21–16:12, 21:18–22).

In February 2013, Plaintiff's direct supervisor, Ted Harris, and his reviewing manager, Jack Requa, assessed Plaintiff's job performance. Dkt. 21-1 at 37 (Pl. Ex. 3). They noted that Plaintiff "is very personable and well respected by his subordinates and peers" and "[h]as a great relationship with the union representatives." *Id.* They stated that Plaintiff had "restarted the employee of the month program" and "started an Employee mentor program." *Id.* at 32. Plaintiff also received an "[o]utstanding" rating for "Safety Conversations," "Accident

Reduction," "Worker's Compensation Reduction," and "DriveCam Coaching Effectiveness." *Id.* at 31. Overall, Plaintiff's evaluators gave him an "[o]utstanding" review, concluding that he was "capable of running a transportation division," had "done an outstanding job of communicating effectively and efficiently his safety needs," and was "very influential and well respected within" WMATA. *Id.* at 40.

In March 2013, Buck witnessed a bus operator named R.V. Mack stop a bus in a crosswalk to load passengers, nearly close the bus doors on a Service Operations Manager, Julio Santana, and then drive the bus forward while still very close to Santana. Dkt. 21-1 at 44 (Pl. Ex. 4); Dkt. 21-2 at 24–25 (Buck Dep. 50:12–51:16); Dkt. 21-2 at 92–93 (Santana Dep. 54:16–55:13). In Plaintiff's view, Mack's behavior constituted a "safety violation." Dkt. 21-2 at 25 (Buck Dep. 51:15–16). Plaintiff later learned that Harris had met with Mack's supervisor, Sophia Coleman-Hill, and a union representative to discuss the incident. Dkt. 21-2 at 22–23 (Buck Dep. 48:6–49:5). According to Plaintiff, when he spoke to Harris about the incident and contradicted Coleman-Hill's account in at least one respect, Harris "got all nasty and [began] yelling at [Plaintiff] saying, [']That's another Superintendent you're calling a liar . . . . This is a team.[']" *Id.* at 25 (Buck Dep. 51:4–11). Santana, who Coleman-Hill accused of falsely claiming that he was injured, suggested at his deposition that Coleman-Hill was attempting to protect Mack from repercussions for his dangerous driving. Dkt. 21-1 at 95–98 (Santana Dep. 57:20–60:10).

Around April 17, 2013, Harris informed Plaintiff by memorandum that it had "come to [his] attention" that Plaintiff's "approach to managing staff and implementing rules, regulations and discipline [was] causing great concern." Dkt. 19-4 (Def. Ex. 3). The memorandum continued: "I believe your approach is intimidating and has created hostility within the Landover

operation to a point that is unacceptable." *Id.* Harris informed Plaintiff that his probationary

period as a new employee would be extended and he would be monitored for "significant

improvement in [his interpersonal] skills." *Id.*

In late September or early October 2013, Plaintiff reviewed a DriveCam video that

showed a bus operator, Warrior Richardson, "turning around away from looking out the front

window, . . . [and] reaching up to an electronic device" called a CleverCAD, which the "operator

logs into" and which keeps track of and provides various kinds of information used in bus

operations, while he was still operating the bus. Dkt. 19-7 at 9–10 (Buck Dep. 33:30–35:16);

Dkt. 19-5 at 2 (Def. Ex. 4) (stating that the violation of the electronic device policy occurred on

September 28, 2013). Using a CleverCAD while operating a bus violated WMATA policy. *See*

Dkt. 19-5 at 3 (Def. Ex. 3) (describing WMATA's electronic device policy). According to

Plaintiff, after viewing the video of Richardson's safety violation, he consulted with Lynda

Jackson from "labor relations," Dkt. 19-7 at 10 (Buck Dep. 35:17–21); Dkt. 21-2 at 67 (Jackson

Dep. 52:1–18), who told him that WMATA policy required termination of any driver who used

such a device while operating a bus, Dkt. 19-7 at 10 (Buck Dep. 37:10–15); *see also* Dkt. 21-2 at

45 (Harris Dep. 29:16–31:16) (testifying that the penalty for using an electronic device, such as a

"cell phone[]," "I-pad[]," or "recording device[]," while operating a bus was termination).

Plaintiff completed his investigation and sent the termination paperwork to Jackson for approval.

Dkt. 19-7 at 11 (Buck Dep. 39:1–10).

Plaintiff issued Richardson a memorandum of dismissal on October 9, 2013. Dkt. 19-5 at

2–4 (Def. Ex. 4). The memorandum explained that the DriveCam footage showed Richardson

using an electronic device while operating a bus and that this conduct violated WMATA's "Zero

Tolerance" policy. *Id.* at 2–3. The memorandum further stated that Office Manager Carol

Martin interviewed Richardson on October 3, 2013; that the two viewed the recording together; and that Richardson told Martin that he was "attempting to log off in the radio." *Id.* at 2; *see also* Dkt. 21-1 at 49 (Pl. Ex. 6) (summarizing Richardson's description of the event).

The next day, October 10, 2013, Buck emailed Harris informing him that he had terminated Richardson one day earlier "for Violating the Electronic Device Policy by using the bus radio to log off." Dkt. 19-5 at 5 (Def. Ex. 4). Buck apologized to Harris "for not sending this [email] earlier" and explained that he had "counseled with Lynda Jackson before taking the action." *Id.* Buck testified at his deposition that he "had an email set up to notify" Harris on October 9, 2013; that he "thought [he] had sent it;" and that he only realized "when [he] looked" at his emails "the next day" that he had forgotten to "hit 'send.'" Dkt. 19-7 at 11–12 (Buck Dep. 41:13–42:7).

On October 11, 2013, Harris went to Buck's office and informed Buck that he "was terminated." Dkt. 19-7 at 8–9 (Buck Dep. 29:8–30:14). A memorandum dated October 10, 2013, from Harris and addressed to Buck, discusses the reasons for Buck's termination. Dkt. 19-6 (Def. Ex. 5). It mentions the April memorandum that had informed Buck of his inadequate performance and had extended his probationary period. *Id.* at 1. The memorandum states: "Team Members . . . have expressed extreme dissatisfaction with your administrative approach and your inflexibility to deal with discipline through proper internal protocols and CBA [Collective Bargaining Agreement] regulations. Most recently, you terminated an employee without properly and thoroughly" discussing the matter with either "Labor Relations staff" or Harris. *Id.* Buck testified that no one showed him this memorandum on the day he was terminated. Dkt. 19-7 at 8 (Buck Dep. 28:1–19). Buck further testified that, after his termination, he learned that Richardson was the son of Coleman-Hill, the WMATA

superintendent who had been involved in the earlier conflict over the safety incident involving Mack and Santana.  Dkt. 19-7 at 12 (Buck Dep. 43:17–44:14).

**B.      Procedural History**

Buck filed a NTSSA complaint with the Secretary of Labor's "Region 3 OSHA Whistleblower Office on March 10, 2014," Dkt. 1 at 6 (Compl. ¶ 24), within the 180 days of his termination, as required by the statute, 6 U.S.C. § 1142(c)(1) (requiring an aggrieved party to file a complaint with the Secretary of Labor within 180 days of the alleged NTSSA violation).  That office began an investigation with which Buck cooperated.  Dkt. 1 at 6 (Compl. ¶ 25).  After 210 days passed without the Secretary of Labor issuing a final order, *id.*; 6 U.S.C. § 1142(c)(7) (providing for "de novo review in the appropriate district court of the United States" "if the Secretary of Labor has not issued a final decision within 210 days after the filing of the complaint and if the delay is not due to the bad faith of the employee"), Plaintiff filed this lawsuit, alleging that WMATA had retaliated against him in violation of the NTSSA, *see generally*, Dkt. 1 (Compl.).  Buck seeks "expungement of any and all references to the adverse actions related to [his] protected activities," as well as compensatory, punitive, and special damages including attorney's fees and costs.  Dkt. 1 at 6–7 (Compl.).  After the parties completed discovery, WMATA moved for summary judgment on multiple grounds, including its asserted Eleventh Amendment immunity from suit.  Dkt. 19.

## II.  ANALYSIS

WMATA makes three arguments.  First, it argues that the Eleventh Amendment bars Plaintiff's suit under the NTSSA.  *Id.* at 9.  Second, it asserts that Plaintiff's conduct cannot serve as the basis for a retaliation claim under the NTSSA because it fell within his normal job duties.  *Id.* at 12.  Third, it argues that Plaintiff's reporting of dangerous conduct did not

contribute to his termination, but, rather, that his failure to follow proper protocols in firing

another employee caused his termination. *Id.* at 13. The Court reaches only WMATA's first

argument because, as explained below, Plaintiff's suit is barred by sovereign immunity, and the

Court, accordingly, lacks Article III jurisdiction. *See Seminole Tribe of Fla. v. Florida*, 517 U.S.

44, 64 (1996) (observing that "the fundamental principle of sovereign immunity . . . limits the

grant of judicial authority in Article III") (quoting *Pennhurst State Sch. & Hosp. v. Halderman*,

465 U.S. 89, 97–98 (1984))).

## A.      Sovereign Immunity

All agree that, absent a lawful waiver or abrogation of sovereign immunity, WMATA is

immune from suit. As the D.C. Circuit has explained, "WMATA . . . was created by an

interstate compact among Maryland, Virginia, and the District of Columbia, and [it] enjoys the

Eleventh Amendment immunity of the two signatory states," as well as immunity conferred upon

it by Congress. *Barbour*, 374 F.3d at 1163; *see also Morris v. Wash. Metro. Area Transit Auth.*,

781 F.2d 218, 219 (D.C. Cir. 1986) ("WMATA's sovereign immunity exists because the

signatories have successfully conferred their respective sovereign immunities upon it."); *Jones v.

Wash. Metro. Area Transit Auth.*, 205 F.3d 428, 432 (D.C. Cir. 2000) (same). To be sure, "'by

its terms[,] the [Eleventh] Amendment applies only to suits against a State by citizens of another

State," but "the Supreme Court has 'extended the Amendment's applicability to suits by citizens

against their own states.'" *Barbour*, 374 F.3d at 1163 (quoting *Bd. of Trs. of Univ. of Ala. v.

Garrett*, 531 U.S. 356, 362 (2001)). The sovereign immunity of the States—and, by extension,

WMATA—however, is not absolute and is subject to "two important exceptions." *Id.* First, in

an exercise of its power under section 5 of the Fourteenth Amendment, Congress may abrogate

the Eleventh Amendment immunity of the States. *Id*. Second, "a state may *waive* its immunity and consent to suit." *Id.*

In the present context, the Court need not linger over the first of these exceptions. Plaintiff does not contend—nor could he contend—that Congress enacted the NTSSA or otherwise authorized whistleblower suits against entities like WMATA as an exercise of Congress's authority to enforce the Fourteenth Amendment, *see*, *e.g., Tennessee v. Lane*, 541 U.S. 509, 518, 533 (2004); *Hibbs*, 538 U.S. at 726, or any similar grant of legislative power that might supersede the Eleventh Amendment, *see*, *e.g., Fitzpatrick v. Bitzer*, 427 U.S. 445, 455–56 (1976) (suggesting that Congress possesses similar authority under the other "Civil War Amendments" to intrude on "autonomy previously reserved to the States"). To determine whether a statute abrogates the sovereign immunity of the States, the Court must resolve two questions: First, the Court must determine "whether Congress unequivocally expressed an intent to abrogate that immunity." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73 (2000). Second, "if it did," the Court must consider "whether Congress acted pursuant to a valid grant of constitutional authority." *Id*.; *see also Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 726 (2003) (noting that Congress may abrogate state sovereign immunity "if it makes its intention to abrogate unmistakably clear . . . and acts pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment").

For present purposes, resolution of the second question is both clear and dispositive, and thus the Court need not consider whether Congress expressed unequivocal intent to abrogate state sovereign immunity in enacting the NTSSA. In *Seminole Tribe*, the Supreme Court overruled *Pennsylvania v. Union Gas*, 491 U.S. 1 (1989), and held that Congress lacks power under Article I of the Constitution to abrogate the Eleventh Amendment immunity of the States.

517 U.S. at 72–73.  Because the NTSSA constitutes classic Commerce Clause legislation, that ends the matter.  *See* National Transit Systems Security Act of 2007, Pub. L. No. 110-53, § 1403(6), 121 Stat. 266 (Congressional finding that "greater Federal investment in transit security . . . is necessary . . . given transit's vital importance in creating mobility and promoting our Nation's economy").

The more difficult question is whether WMATA has waived its immunity.  "The test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one."  *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241 (1985).  "Generally, [courts] will find a waiver either if the State voluntarily invokes [the court's] jurisdiction, . . . or . . . if the State makes a 'clear declaration' that it intends to submit itself to [the court's] jurisdiction."  *Coll. Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675–76 (1999) (citation omitted).  A court may also find a waiver when a "suability provision [is] attached to the congressional approval of" a multistate commission created by interstate compact.  *Id.* at 686; *see also Petty v. Tennessee-Missouri Bridge Comm'n*, 359 U.S. 275, 279–80 (1959) (holding that States had waived the sovereign immunity of a bi-state corporation created by an interstate compact in which Congress had approved a "sue and be sued" clause); *Edelman v. Jordan*, 415 U.S. 651, 696 (1974) (Marshall, J., dissenting) (discussing *Petty*).  Finally, Congress may, pursuant to its spending power, elicit a "'clear declaration' that [a state] intends to submit itself to" suit in federal court as a condition for a grant of federal funds.  *Coll. Savings Bank*, 527 U.S. at 686; *see also Barbour*, 374 F.3d at 1163.  "But Congress must exercise its power explicitly: a congressional waiver provision is constitutional only if it manifests 'a clear intent to condition participation in the programs funded

under the Act on a State's consent to waive its constitutional immunity.'"  *Barbour*, 374 F.3d at 1163 (quoting *Atascadero*, 473 U.S. at 247).

In opposing WMATA's sovereign immunity defense, Plaintiff does not contend that Virginia, Maryland, and the District of Columbia or the WMATA Compact has waived WMATA's immunity from private suit under the NTSSA.  Instead, Plaintiff's argument rests exclusively on the following syllogism: (1) the CRREA placed the States on clear notice that, by accepting certain federal grants, they would waive their immunity from suit under "section 504 of the Rehabilitation Act of 1973, title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, title VI of the Civil Rights Act of 1964, or *the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance*," 42 U.S.C. § 2000d-7(a)(1) (emphasis added); (2) the NTSSA defines a "public transportation agency" to mean "a publicly owned operator of public transportation *eligible to receive Federal assistance*" from the Department of Transportation, 6 U.S.C. § 1131(5) (emphasis added), and subjects "public transportation agenc[ies]" to private suit if they "*discriminate* against an employee" who qualifies as a whistleblower, 6 U.S.C. § 1142(a) (emphasis added); (3) WMATA has received federal grants under 49 U.S.C. §§ 5301–5340; and, therefore, (4) WMATA waived its sovereign immunity under the CRREA with respect to whistleblower suits under the NTSSA by accepting federal transportation funding.  Dkt. 21 at 12–17.  For the reasons explained below, the Court is unpersuaded.

**B.     CRREA**

In *Atascadero State Hospital v. Scanlon*, 473 U.S. 234 (1985), the Supreme Court addressed whether a state hospital was subject to suit for retroactive monetary relief in federal

court under Section 504 of the Rehabilitation Act.  The relevant provisions of the Rehabilitation Act, as enacted at the time, provided that:

> No otherwise qualified handicapped individual in the United States . . . shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.
>
> . . . .
>
> The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title.

29 U.S.C. §§ 794–794a (1982).  Years earlier, the Supreme Court had recognized an implied right of action for injunctive relief and damages under Title VI of the Civil Rights Act.  *See Cannon v. Univ. of Chi.*, 441 U.S. 677, 695–703 (1979) (acknowledging Title VI's implied right of action in the course of analyzing Title IX).  Because Congress extended the remedies available under Title VI to the Rehabilitation Act, and because the defendant in *Atascadero* was undeniably a "recipient of federal aid under the statute," 473 U.S. at 245–46, it was thus—absent Eleventh Amendment or other Federalism concerns—subject to suit in federal court under the Rehabilitation Act.

Such sovereign immunity concerns, however, were ultimately dispositive in *Atascadero*. The Supreme Court first held that a provision found in the California constitution waiving immunity for suits "brought against the State in such manner and in such courts as shall be directed by law" lacked the clarity required to waive the State's immunity from suit "in *federal* court."  *Id.* at 241 (first quote quoting Cal. Const. art III. § 5).  It then held that the U.S. Congress did not make "its intention unmistakably clear in the language of the [Rehabilitation Act]," as required by the Court's Eleventh Amendment jurisprudence, to abrogate California's immunity

pursuant to Section 5 of the Fourteenth Amendment. *Id*. at 242. As the Court explained, it is not enough that Congress authorize suit in federal court against a broad class of potential defendants. Rather, "[w]hen Congress chooses to subject the States to federal jurisdiction, it must do so specifically." *Id*. at 246. Finally, the Court held that California's "mere receipt of federal funds" was insufficient to "establish that [the] State ha[d] consented to suit in federal court." *Id*. at 246–47. Once again, the relevant statutory language lacked the requisite lucidity. The text fell "far short of manifesting a clear intent to condition participation in the programs funded under the Act on a State's consent to waive its constitutional immunity." *Id*. at 247.

In response to the Supreme Court's decision in *Atascadero*, Congress enacted the CRREA "to provide the sort of unequivocal waiver" of Eleventh Amendment immunity to suits under the Rehabilitation Act and other anti-discrimination statutes that *Atascadero* and other precedent demanded. *Lane v. Pena*, 518 U.S. 187, 200 (1996); *see* Pub. L. No. 99-506, § 1003, 100 Stat. 1807, 1845 (1986). To that end, the CRREA provides:

> (1)    A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973, title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, title VI of the Civil Rights Act of 1964, or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

> (2)    In a suit against a State for a violation of a statute referred to in paragraph (1), remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation against any public or private entity other than a State.

42 U.S.C. § 2000d-7(a). As the D.C. Circuit held in *Barbour v. Wash. Metro. Area Transit Auth.*—a case involving the same defendant here—the language of the CRREA and the Rehabilitation Act, taken together, is "undeniably clear about the simple choice offered to states: if they accept federal funds, they will lose their immunity to Rehabilitation Act suits for

discriminatory acts."  374 F.3d at 1165.  "WMATA could have avoided" this result "by declining

to take federal transportation funds," but because "[i]t chose not to," it "voluntarily exposed itself

to the suits the [Rehabilitation Act] authorizes."  *Id.*   Although not addressed in *Barbour*, that

same logic, moreover, applies to suits brought against WMATA under Title IX, the Age

Discrimination Act, and Title VI.  *See*, *e.g., Litman v. George Mason Univ.*, 186 F. 3d 544, 554

(4th Cir. 1999) (relying on 42 U.S.C. § 2000d–7(a)(1) to find waiver of sovereign immunity for

purposes of Title IX); *Fryberger v. Univ. of Ark.*, 889 F.3d 471, 477 (8th Cir. 2018) (same).

Thus, little effort is required to conclude that, by accepting federal transportation funds,

WMATA has voluntarily exposed itself to the suits that those statutes specifically identified in

the CRREA authorize.

Plaintiff's task here, however, is not so easy because, unlike the Rehabilitation Act, Title

IX, the Age Discrimination Act, and Title VI, the NTSSA is not expressly referenced in the

CRREA, and it is far from clear that the NTSSA qualifies as "any other Federal statute

prohibiting discrimination by recipients of Federal financial assistance."  42 U.S.C. § 2000d-

7(a)(1).  In this context, where "[a] waiver of sovereign immunity must be 'strictly construed, in

terms of its scope, in favor of the sovereign,'" *Sossamon v. Texas*, 563 U.S. 277, 292 (2011)

(citation omitted), and where a statute conditioning receipt of federal funding on a waiver of

sovereign immunity must "manifest[] a clear intent" to impose such a condition, *Atascadero*, 473

U.S. at 247; *see also Barbour*, 374 F.3d at 1163 (quoting same), that uncertainty is dispositive.

Plaintiff's argument that the NTSSA falls within the residual clause of the CRREA

appeals to plain language.  The CRREA's residual clause reaches "any other Federal statute

prohibiting discrimination by recipients of Federal financial assistance."  42 U.S.C. § 2000d-

7(a)(1).  The NTSSA is, of course, a federal statute.  42 U.S.C. § 1142.  It also makes it unlawful

for a covered employer to "discriminate against" a whistleblower: the NTSSA declares that public transportation agencies "shall not discharge, demote, suspend, reprimand, or in any other way *discriminate* against" a covered whistleblower. 42 U.S.C. § 1142(a) (emphasis added). And, finally, the statute applies to "public transportation agenc[ies]," *id.*, which are defined to mean "publicly owned operator[s] of public transportation eligible to receive Federal assistance" from the Department of Transportation, 6 U.S.C. § 1131(5). In short, Plaintiff plausibly posits that the NTSSA is a "Federal statute prohibiting discrimination by recipients of Federal financial assistance." 42 U.S.C. § 2000d-7(a)(1). That contention, moreover, finds some support in the D.C. Circuit's *Barbour* decision, which held that WMATA qualified, within the terms of the CRREA, as a "recipient of Federal financial assistance" for purposes of suit under the Rehabilitation Act. 374 F.3d at 1165. If so, one might reasonably wonder why the same conclusion would not apply for purposes of a "discrimination" claim brought under the NTSSA.

The answer to that question starts with the Supreme Court's decision in *Sossamon v. Texas*, 563 U.S. 277 (2011). In that case, the Supreme Court considered whether the CRREA's residual clause placed the States on clear notice that, if they accepted federal funding, they would waive their immunity from suit under Section 3 of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C.§ 2000cc *et seq.* *Sossamon*, 563 U.S. at 291. The Court held that it did not, principally because the text of Section 3 of RLUIPA, unlike Section 2 of that Act, "does not prohibit 'discrimination'" but, rather, "prohibits 'substantia[l] burden[s]' on religious exercise." *Id.* at 292. Because "a State might reasonably conclude that" the CRREA's residual clause "covers only provisions using the term "'discriminate,'" the Supreme Court held that the clause did not constitute the sort of unequivocal waiver of sovereign immunity that *Atascadero* and other precedent demands. *Id.*

That narrow holding is not dispositive here because, unlike Section 3 of RLUIPA, the NTSSA does use the word "discriminate." *Compare* 42 U.S.C.§ 2000cc-1, *with* 6 U.S.C. § 1142(a). The Court's broader reasoning, however, points in favor of WMATA's claim of immunity. In *Sossamon*, the Court first questioned, but did not decide, whether "a residual clause like the one in [the CRREA] could constitute an unequivocal textual waiver." *Id.* In reserving judgment on this question, the Court did not, of course, decide the issue. It did, however, emphasize that ambiguity or uncertainty is incompatible with a waiver of sovereign immunity. In addition—and more significantly—the Court applied the *ejusdem generis* canon of statutory interpretation applies to CRREA's residual clause. As the Court explained, "'[g]eneral words,' such as the residual clause here, 'are construed to embrace only objects similar in nature to those objects enumerated by the proceeding specific words.'" *Id*. (quoting *Washington State Dep't of Soc. and Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384 (2003)). The Court's application of the *ejusdem generis* canon in this specific context is significant because, like other canons, it merely aids in construction and sometimes yields to other textual clues and considerations. *See*, *e.g., Ali v. FBI*, 552 U.S. 214, 227–28 (2008). Although not inevitable, it is also not surprising that the Court concluded that the canon applies to the CRREA because the canon tends to limit the reach of the statutory provision at issue and thus promotes the interest in clarity that otherwise animates the Court's Eleventh Amendment jurisprudence.

Applying both of these guiding principles here—one, that waivers of sovereign immunity demand clarity and, two, that the residual clause must be read in light of the "objects" that precede it—the Court cannot accept Plaintiff's contention that CRREA's waiver of sovereign immunity encompasses private suits to enforce NTSSA's whistleblower provisions. Each of the four antidiscrimination statutes enumerated in the CRREA deal with a similar type of

transgression and each takes a similar form. Each prohibits discrimination based on a personal characteristic, and each prohibits that discrimination in any program or activity receiving Federal financial assistance. Starting with Title VI of the Civil Rights Act of 1964, Congress prohibited discrimination on the basis of "race, color, or national origin" in "any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Eight years later, using identical language, Congress extended that prohibition to discrimination "on the basis of sex" in "any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The next year, Congress prohibited discrimination based on a person's disability in "any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). And, finally, in 1975, Congress followed the same model and prohibited discrimination "on the basis of age" in "any program or activity receiving Federal financial assistance." 42 U.S.C. § 6102. Significantly, the CRREA's residual clause employs a similar locution, referring to "other federal statutes" that prohibit discrimination by recipients of "Federal financial assistance." 42 U.S.C. § 2000d-7(a)(1).

Although the NTSSA does use the word "discriminate," and although it regulates agencies eligible to receive federal funds, those superficial parallels are the extent of its similarities with the statutes enumerated in the CRREA. Unlike the enumerated statutes, the NTSSA was not enacted to ensure equal access to the benefits of federally funded programs but, rather, "to implement the recommendations of the National Commission on Terrorist Attacks Upon the United States, also known as the 9/11 Commission." *Duncan v. Wash. Metro. Transit Auth.*, 174 F. Supp. 3d 123, 127 (D.D.C. 2016) (citing Pub. L. No. 110-53, tit. XIV, 121 Stat. 266, 400 (2007)). The purpose of the whistleblower provision is not to prevent invidious, class-based discrimination but, rather, to "protect [public transit] employees from adverse employment

impacts due to whistleblower activities related to [transit] security." *Id.* (quoting H.R. Rep. No. 110-259, at 348 (July 25, 2007), as reprinted in 2007 U.S.C.C.A.N. 119, 180)). The provision is not modeled on Title VI or any other civil rights law but, rather, is drawn from similar protections available to railroad, 49 U.S.C. § 20109, and aviation employees, 49 U.S.C. § 42121. *See also* H.R. Rep. No. 110-259, at 348 (2007) (Conf. Rep.) (noting that § 20109 protects "railroad employees from adverse employment impacts due to whistleblower activities"). And the NTSSA does not prohibit discrimination in programs that *receive* federal funding but, rather, applies more generally to agencies "*eligible* to receive Federal financial assistance," 6 U.S.C. § 1131(5) (emphasis added), regardless of whether they actually receive any such funding in a given year.[1]

Given these important differences, the Court cannot conclude that the NTSSA is "similar in nature" to the enumerated statutes. *Sossamon*, 563 U.S. at 292 (quoting *Washington State Dep't of Soc. and Health Servs.*, 537 U.S. at 384). Each of the enumerated statutes prohibits class-based discrimination—that is, discrimination based on a personal characteristic, such as race, national origin, age, sex, or disability. Each is fairly described as a civil rights statute—the presumptive target of the Civil Rights Remedies Equalization Act. *See* 132 Cong. Rec. 28,623 (1986) (statement of Sen. Alan Cranston) (CRREA "make[s] clear that the States may be held

---

[1] Although one might argue that Congress intended to cover only those state or local agencies that actually receive federal financial assistance, that contention is tested by the fact that the two statutes on which the NTSSA is modeled—49 U.S.C. § 20109 and 49 U.S.C. § 42121—apply to "railroad carrier[s]" and "air carrier[s]" respectively without regard for whether they receive federal funding. *See* 49 U.S.C. § 20102(3) (defining "rail carrier" for the purposes of § 20109); *id.* § 40102(a)(2) (defining "air carrier" for the purposes of § 42121). One might also argue that the distinction between those who are eligible to receive federal funding and those who actually receive such funding is immaterial in a case, such as this one, where the state entity did, in fact, receive federal funding. But the relevant question for present purposes is simply whether the NTSSA is similar to the enumerated statutes, and this distinction bears on that question.

accountable in Federal court for injuries they inflict on disabled persons, women, members of minority groups, and older person[s] through violations of such [civil rights] statutes.").  And each ensures that the benefits of federally funded programs are equally available to all, regardless of their race, national origin, sex, or disability.  The NTSSA, in contrast, is a public safety statute, designed to ensure that employees of public transportation agencies and their contractors and subcontractors are not dissuaded from flagging potential violations of federal safety or security rules (or the abuse of Federal grants intended for public safety or security) committed by their employers or their co-workers.  Although the NTSSA uses the word "discriminate," it does so in very different manner than the CRREA and the enumerated statutes. In the NTSSA, the term rounds out a list of adverse employment actions: "discharge, demote, suspend, reprimand, or *in any other way discriminate against*," 6 U.S.C. § 1142(a) (emphasis added), all prohibited in service of the statutory goal of promoting public safety.  In the CRREA and the enumerated statutes, in contrast, discrimination is itself the iniquity that the statute seeks to prevent.  That difference, and the other discrepancies highlighted above, are likely sufficient to conclude, without more, that the CRREA's residual clause is not best construed to cover the NTSSA.  *See Clemes v. Del Norte Cty. United Sch. Dist*., No. C-93-1912, 1996 WL 331096, at *6 (N.D. Cal. May 28, 1996) (concluding that although a provision in the False Claims Act "uses the term 'discrimination'" it was not "within the ambit of" § 2000d-7(a)(1)'s residual clause because its purpose is to "address[] fraud," whereas the purposes of the enumerated statutes is to prohibit discrimination on the basis of particular characteristics).  But, given sovereign immunity doctrine's demands of clarity, the conclusion is inescapable that the CRREA could not facilitate WMATA's waiver of its sovereign immunity to claims under the NTSSA.

## C.  WMATA Policy

In a final effort to overcome this conclusion, Plaintiff notes that WMATA "instituted its own policy expressing its intention to be bound by the NTSSA," confirming, in Plaintiff's view, that WMATA was on notice that it would waive its sovereign immunity by accepting federal funds and that it intended to accept that bargain.  Dkt. 21 at 17.  Plaintiff is correct that a WMATA policy, apparently approved by the WMATA Board of Directors, acknowledges that WMATA is subject to the NTSSA and that its officers and employees may not "discharge, demote, suspend, reprimand, or in any other way discriminate against an [e]mployee for engaging in activity that is protected under the NTSSA."  Dkt. 21-1 at 22.  The policy further affirms that "[t]he Board is responsible to ensure that [WMATA] is complying with the NTSSA and any other federal law, rule, or regulation relating to public transportation safety or security, or fraud, waste, or abuse of federal grants or other public funds intended to be used for public transportation safety or security."  *Id.* at 23.  Finally, the policy provides an internal enforcement mechanism, which contemplates an investigation by the Office of the Inspector General and an appeal to an internal panel, while preserving WMATA employee's "access to other applicable processes for redress" under "applicable federal law, another [WMATA policy] or grievance procedure under applicable collective bargaining agreements."[2]  *Id.* at 28.

---

[2]  Plaintiff does not argue that this WMATA policy itself functioned to waive WMATA's sovereign immunity, and, in any event, such an effort would prove unavailing.  By now, it almost goes without saying a waiver of sovereign immunity requires a "'clear declaration' by the State," *Sossamon*, 563 U.S. at 284 (quoting *Coll. Savings Bank*, 527 U.S. at 680), including a declaration of "the State's intention to subject itself to suit in *federal court*," *Atascadero*, 473 U.S. at 241 (emphasis in original).  Here, however, the policy makes no mention of suit in any court—state or federal.  Dkt. 21-1 at 28.  To be sure, the policy acknowledges WMATA's obligation to comply with federal law.  But that is not the same thing as a waiver of immunity from private suit to enforce that obligation.

Plaintiff's argument, however, fails to grasp the distinction between WMATA's obligation to comply with federal laws, including the NTSSA, and its immunity from private suit in the absence of a sufficient waiver or abrogation of that immunity. The Court has no doubt that the NTSSA applies to WMATA and that it prevents WMATA from taking adverse action against covered whistleblowers. WMATA is duty-bound to comply with the statute, regardless of whether it is subject to suit for its failure to do so. Indeed, the WMATA Compact is clear: WMATA is subject to local and federal "laws, rules, regulations and orders relating to . . . safety." WMATA Compact, Art. XVI, § 77; D.C. Code § 9-1107.01. Nothing in the Eleventh Amendment or broader concepts of sovereign immunity relieves WMATA of its obligation to comply with federal law. To the contrary, "[t]he States and their officers are bound by obligations imposed by the Constitution and by federal statutes that comport with the constitutional design," including the Supremacy Clause, U.S. Const. Art. IV, and courts should not "assume [that] the States will refuse to honor the Constitution or [to] obey the binding laws of the United States." *Alden v. Maine*, 527 U.S. 706, 755 (1999). Against this background, it is appropriate that a WMATA policy demands that its officers and employees comply with the NTSSA. But that undertaking—or recognition of an existing obligation—has no bearing on WMATA's immunity from private suit.[3]

$$*\quad*\quad*$$

---

[3] Given this conclusion, the Court need not consider or decide whether WMATA is bound to comply with the administrative enforcement processes established in the NTSSA, *see* 6 U.S.C. § 1142(c), including whether those processes are so similar to civil litigation that principles of sovereign immunity attach, *see FMC v. South Carolina State Ports Auth.*, 535 U.S. 743, 756–64 (2002), or whether the WMATA Compact overcomes any such immunity by subjecting WMATA to the "force and effect" of federal "laws, rules, regulations and orders relating to . . . safety," WMATA Compact, Art. XVI, § 77; D.C. Code § 9-1107.01.

For all of these reasons, the Court concludes that nothing contained in the CRREA or the NTSSA has effected a waiver of WMATA's sovereign immunity and that, because Plaintiff has failed to identify or to invoke any other waiver or abrogation of sovereign immunity, the Court lacks jurisdiction over Plaintiff's claims.[4]

**CONCLUSION**

For the foregoing reasons, the Court will GRANT Defendant's motion for summary judgment, Dkt. 19, and will DISMISS the complaint without prejudice for lack of subject-matter jurisdiction.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  December 5, 2019

---

[4]  Although Plaintiff requests certain prospective, non-monetary relief—that is, "expungement of any and all references to the adverse actions" taken against him—he has not brought an action under *Ex parte Young*, 209 U.S. 123 (1908), against an appropriate official, and therefore, at least as the case is currently pled, the Court lacks jurisdiction to adjudicate even that narrow claim for relief, *cf. Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007).